# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Laurian M. Lane,

     Plaintiff,

v.

Carolyn W. Colvin, Commissioner of
Social Security,

     Defendant.

Case No. 0:16-cv-00364-MJD-KMM

**REPORT AND
RECOMMENDATION**

---

Stephanie M. Balmer, Falsani Balmer Peterson Quinn & Beyer, counsel for plaintiff

Gregory G. Brooker, United States Attorney's Office, counsel for defendant

---

## Introduction

    Laurian M. Lane applied to the Social Security Administration ("SSA") for disability benefits on April 1, 2013. (Tr. of Admin. Record ("AR") at 158-64, 204, ECF No. 9.) In her application, Ms. Lane indicated that she is disabled and cannot engage in substantial work activities because she suffers from asthma and back problems, including scoliosis. (AR 208; *see id.* at 386 (noting "long history of scoliosis").) She also asserts that she is disabled due to a combination of other impairments including: additional pulmonary complications; cervical spine/neck issues; severe headaches; shoulder pain; tremors in her hands; urology disorders; sleep

disorder; depression and anxiety; and memory and cognitive issues. (Pl.'s Mem. 3-7, ECF No. 14 (describing plaintiff's "medical conditions and resulting limitations").)

The SSA denied Ms. Lane's application, and she requested a hearing before an administrative law judge ("ALJ"). (AR 107-08, 112-13.) On July 29, 2015, the ALJ held a hearing at which Ms. Lane testified about her impairments and their effect on her life. (AR 42-74.) After the hearing, the ALJ denied Ms. Lane's request for disability benefits in a September 9, 2015 written decision. (AR 15-41.) Ms. Lane sought review of the ALJ's decision, but the SSA's Appeals Council denied that request. (AR 10-14.) The ALJ's decision became the final decision of the Commissioner of Social Security on December 18, 2015, and Ms. Lane filed this action seeking judicial review. 42 U.S.C. § 405(g).

Consistent with Local Rule 7.2, the parties filed motions for summary judgment. Ms. Lane asks the Court to reverse the Commissioner's decision and award her disability benefits. (Pl.'s Mot. for Summ. J., ECF No. 13.) In the alternative, she asks the Court to remand this action back to the Commissioner for further proceedings. (*Id.*) Ms. Lane asserts that she is entitled to relief for the following reasons:

    (1) the ALJ ignored substantial evidence that she has serious neck problems;
    (2) the ALJ erred in finding that there was insufficient evidence that her urology disorders were severe;
    (3) the ALJ erroneously concluded that her headaches were controlled by medication and inconsistent;
    (4) the ALJ erred by refusing to consider medical evidence from after March 31, 2012; and

(5) the ALJ erred by concluding that she is capable of doing "light work." (Pl.'s Mem. at 9-15.)  The Commissioner asserts that the ALJ's decision suffered from no such errors and asks the Court to affirm the conclusion that Ms. Lane is not disabled within the meaning of the Social Security Act.  (Def.'s Mem., *passim*, ECF No. 17.)

### Ms. Lane's Work History, Medical History, and Hearing Testimony[1]

Before she applied for disability benefits, Ms. Lane, who is now fifty-seven years old, worked for several years as a medical secretary, a medical assistant, and a nurse's aide.  She also held a job as a lunchroom monitor for a school district, and worked part-time for several years at fast-food restaurants.  Though she did part-time work in the fast-food industry after March 13, 2007, she has not worked a full-time job or engaged in other substantial gainful activity since then.

Ms. Lane has a lengthy history of medical issues.  She has suffered from scoliosis since she was a child, which required her to undergo surgery at age 13 and again twenty years ago, including the installation of hardware in her spine.[2]  (AR 57 (ALJ's statements at the hearing); *id.* at 320 (noting placement of hardware in 1998);

---

[1]    This is a brief overview of Ms. Lane's work history and medical conditions.  A more thorough discussion of the facts necessary to address each of Ms. Lane's specific challenges to the ALJ's findings is found in the relevant sections below.

[2]    Ms. Lane has a surgical device, known as a Harrington implant or Harrington rod, implanted in her spine to address the complications caused by scoliosis.  (AR 64.)

*id.* at 326 (noting placement of Harrington rod in 1996).)  She has sought treatment for asthma and other pulmonary conditions.  (AR 318, 338, 425-26, 723.)  Ms. Lane has a history of migraine headaches.  (*See, e.g.*, AR 315-16, 343-45, 373-75, 422-24, 459-60, 643-44, 651.)  Ms. Lane has also endured urological disorders marked by recurrent urinary tract infections and an episode of acute renal failure in February 2010.  (*See, e.g.*, AR 325-26, 333-34, 405-07, 661.)  More recently, examinations of her neck, have revealed disorders in her cervical spine.  (AR 470-71.)  In June 2013, she also was diagnosed as having cognitive deficits due to cerebrovascular disease. (AR 935.)  Ms. Lane had surgery on her left shoulder in November 2013 (AR 1136-37), and she sought treatment for right shoulder pain in February 2014 (AR 949).

When she testified at the hearing before the ALJ, Ms. Lane explained why she does not feel able to work.  Ms. Lane experiences pain in her legs, which is exacerbated by as little as fifteen minutes of driving.  (AR 48-49.)  She also regularly experiences tremors in her hands that she says affect her ability to do simple tasks like holding a paper plate, but she can do household chores and grocery shopping. (AR 50-51, 53, 62.)  When she walks short distances or engages in similar activities, Ms. Lane testified that she gets short of breath due to her pulmonary conditions, including asthma.  (AR 60-61.)  Ms. Lane at times finds it difficult to maintain her balance and has weakness in her legs, causing her to fall several times a month. (AR 61.)  She experiences symptoms of depression and anxiety and has endured several unfortunate experiences in her family life.  (AR 53-54, 58.)  And Ms. Lane has

issues with her memory, which make playing board games and following recipes more difficult and frustrating for her.  (AR 59.)

### The ALJ's Decision

The ALJ determined that Ms. Lane is not disabled and explained the basis for that determination in a written decision.  The ALJ found that Ms. Lane's severe impairments for the period between March 13, 2007 and March 31, 2012 include: chronic headaches/migraines; chronic back pain with a history of discectomy and fusion in the lumbar spine; restrictive lung disease; and adjustment disorder with mixed anxiety and depressed mood.  (AR 20.)  The ALJ found that Ms. Lane's other alleged impairments, such as her urological disorders and the trouble with her hands, were not "severe."  (*Id.*)  The ALJ further determined that Ms. Lane's severe impairments could reasonably be expected to cause her symptoms.  However, he concluded that the medical evidence did not support a finding that those symptoms would prevent her from doing work that accommodates her physical and mental abilities.  (AR 26-36.)

### The Court's Standard of Review

This Court's task is not to imagine how it would balance the considerations inherent in Ms. Lane's claim of disability, but to review the ALJ's evaluation of those considerations and ensure that it comports with the law and is supported by the evidence.  The Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g), and the Commissioner's findings "as to any fact, if supported by substantial

evidence, shall be conclusive." 42 U.S.C. § 405(g). This review is deferential, *see Kelley v. Barnhart*, 372 F.3d 958, 960 (8th Cir. 2004), and is "limited to determining whether there is substantial evidence based on the entire record to support the ALJ's factual findings, and whether [her] decision was based on legal error." *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996); *see also Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "Substantial evidence is less than a preponderance of the evidence, but is such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion." *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (internal citations and quotation marks omitted).

Although the ALJ's decision merits deference, this Court must also ensure that the ultimate decision properly considered those facts that weigh against the ALJ's conclusion as well as those that support it. "There is a notable difference between substantial evidence and substantial evidence on the record as a whole. . . . [Review of the whole record] must take into account whatever in the record fairly detracts from [an administrative decision's] weight." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (internal quotation marks omitted). Nonetheless, the Court should "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (internal citations omitted). And where substantial evidence supports the Commissioner's findings, the Court should not

reverse those findings merely because other evidence exists in the record to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994).

## I.   Medical Evidence After Ms. Lane's "Date Last Insured"

Ms. Lane challenges the ALJ's treatment of medical evidence in the record that post-dates March 31, 2012. The ALJ concluded that March 31, 2012 is the date Ms. Lane was last insured under applicable Social Security regulations, a fact Ms. Lane does not dispute. Rather, she contends that the ALJ erred because he "refused to consider medical evidence" from after that date. (Pl.'s Mem. 12-14.)

A claimant seeking disability benefits must establish that she was disabled before the expiration of her insured status. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (concluding that the claimant was not entitled to benefits where she could not prove disability existed before the date last insured); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (same) (citing *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998)). "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'" *Moore*, 572 F.3d at 522 (quoting *Pyland*, 149 F.3d at 877). "New evidence is required to pertain to the time period for which benefits are sought and cannot concern subsequent deterioration of a previous condition." *Id.* at 525 (citing *Jones v. Callahan*, 122 F.3d 148, 1154 (8th Cir. 1997)).

Here, the ALJ did not "refuse to consider medical evidence" from after the insured period. He acknowledged that the record contained medical evidence that post-dated March 31, 2012 and explained how he evaluated it as follows:

> Notably, the claimant has been diagnosed with a number of conditions after the date last insured, March 31, 2012, which cannot be considered medically determinable impairments during the relevant time period from the alleged onset date [March 13, 2007] through the date last insured, as they were not issues prior to the date last insured. Therefore, any diagnosis in the record which did not appear during the relevant time period are [sic] considered non-medically determinable, non-severe impairments with regard to the time period considered here.

(AR 22.) As discussed in more detail below, the ALJ went on to address specific medical records from after March 31, 2012. (*Id.* at 22-23.) For example, the ALJ considered a March 2013 MRI of Ms. Lane's neck and imaging of and treatment for her left shoulder. He noted subsequent diagnoses of "myofacial pain syndrome, degenerative disc disease of the cervical spine, facet joint disease, and cognitive deficits due to cerebrovascular disease." And the ALJ acknowledged newer records showing Ms. Lane's complaints of right shoulder complications. (*Id.*) Ultimately, the ALJ found that none of those newer diagnoses showed the existence of a medically determinable impairment between March 13, 2007 and March 31, 2012. (*Id.*)

*Moore v. Astrue*, 572 F.3d 520 (8th Cir. 2009), relied upon by Ms. Lane in support of her position, does not undermine the ALJ's decision. In *Moore*, the Eighth Circuit Court of Appeals affirmed a district court's order upholding an ALJ's determination that the claimant was not disabled. The claimant in *Moore* argued that

the ALJ failed to consider evidence that she had knee-replacement surgery a year after her insured status expired.  572 F.3d at 525.  The Eighth Circuit rejected this argument, noting that X-rays of the claimant's knee from after her insurance coverage expired showed more deterioration than those taken earlier.  *Id.*  Accordingly, the court concluded that "the ALJ properly determined that [the claimant's] subsequent knee replacement surgeries d[id] not establish she was disabled prior to the expiration of her insurance."  *Id.*  The ALJ here, like the ALJ in *Moore*, was aware of medical evidence post-dating the period of insured status, but concluded that evidence did not show the existence of a disabling condition during the relevant time period.  *Id.*  As in *Moore*, this Court cannot conclude that the ALJ erred in his handling of newer medical evidence.[3]

In sum, the ALJ did not ignore new medical evidence as Ms. Lane contends. *See, e.g.*, *Cox*, 471 F.3d at 907 (affirming ALJ's decision to discount opinion of treating physician given after the date last insured because of its inconsistencies with the greater record).  Because the ALJ reviewed and rejected medical evidence from after the expiration of Ms. Lane's insured status, the Court finds no reversible legal error.

---

[3]    Ms. Lane's memorandum also references *Lacroix v. Barnhart*, 465 F.3d 881 (8th Cir. 2006), and *Strongson v. Barnhart*, 361 F.3d 1066 (8th Cir. 2004).  However, neither of these cases specifically addresses how an ALJ must consider medical evidence from after the claimant's date last insured.

## II.     Cervical Spine and Neck Issues

Ms. Lane argues that substantial evidence does not support the ALJ's

conclusion that her neck condition did not qualify as a severe impairment.[4]  (Pl.'s

Mem. at 9.)  The ALJ concluded that "[t]here is no evidence to establish [a cervical

spine condition] as a medically determinable impairment prior to the date last insured

of March 31, 2012."  (AR 22.)  Ms. Lane contends, however, that she was treated for

neck issues prior to March 31, 2012, and a March 2013 MRI showing

"degenerative . . . processes taking place in [her] neck" revealed that her "cervical

spine condition has been worsening for many years[.]"  (Pl.'s Mem. at 9-10.)

Essentially, she contends that because the March 2103 MRI showed degenerative

changes, which necessarily occur over time, the ALJ should have determined

Ms. Lane's cervical spine/neck issues qualified as a medically determinable severe

impairment before expiration of her insured status. (*See* Pl.'s Mem. at 9-10 ("The MRI

of Plaintiff's cervical spine specifically documents the degenerative (as opposed to

acute) processes taking place in Plaintiff's neck that correlate with her increased

symptomology over the years.").)

---

[4]      Ms. Lane's claim challenges the ALJ's application of step two of the five-step
analysis required for consideration of disability claims.  In raising such a claim,
Ms. Lane bears the burden of proving that her cervical spine/neck condition was a
severe impairment.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *Young v. Apfel*, 221
F.3d 1065, 1069 n.5 (8th Cir. 2000).

Ms. Lane relies on two aspects of the record to support her argument on this point.  First, Ms. Lane twice sought treatment for a neck condition prior to March 31, 2012.  In May 2011, she sought treatment for swelling in the left side of her neck, and on exam Dr. Denver N. Ulland observed her neck was "fully symmetric under symmetric lighting" with symmetrical muscle.  (AR 356.)  When she followed up with her primary care physician, Dr. Steven E. Long, a month later, Ms. Lane had a "completely normal exam."  (AR 353-54.)  After a fall in January 2012, Ms. Lane again sought treatment for neck and back pain, but Dr. Long observed that she was able to drive herself to the appointment "without difficulty and was able to walk into the clinic without assistance."  (AR 320.)  Ms. Lane points the Court to no other treatment records for a neck condition prior to March 31, 2012.

Second, Ms. Lane underwent an MRI of the neck on March 28, 2013, which showed degenerative changes in Ms. Lane's cervical spine.  (AR 22.)  Dr. G. Alan Norris concluded that the MRI showed bulges at C6-7 and C5-6, "small bilateral uncovertebral osteophytes [at] C7-T1," and "mild to moderate multilevel facet arthrosis in the cervical spine" at several discs.  (AR 471.)

Despite these two aspects of the medical record highlighted by Ms. Lane in support of her position, there is substantial evidence in the record as a whole to support the ALJ's conclusion that Ms. Lane's cervical spine/neck condition was not a medically determinable impairment during the period when she was eligible to receive benefits.  The record fails to demonstrate that the ALJ should have found her neck

condition to be a severe impairment.  Ms. Lane's treatment for issues with her cervical spine and neck area prior to March 2012, was limited, consisting of a few visits and receiving largely unremarkable assessments from her treating providers.  And the newer medical records do not reveal the existence of a neck condition prior to March 31, 2012 that significantly limited Ms. Lane's physical ability to do basic work activities during the relevant time.  20 C.F.R. § 404.1520(c) (explaining when an impairment is considered severe for purpose of disability benefits).

The subsequent diagnosis of a degenerative condition does not, by itself, mean that the claimant had a severe impairment during the relevant period.  Rather, that subsequent diagnosis must be considered with the record as a whole.  *See Grebenick v. Chater*, 121 F.3d 1193, 1199 (8th Cir. 1997) (requiring an ALJ to consider a retrospective diagnosis of a degenerative disease as part of the record as a whole when a claimant does not have contemporaneous objective medical evidence of the onset of the disease).  And this is not a case where there was significant evidence showing that Ms. Lane had a persistent and chronic condition during the insured period, the existence and severity of which was simply confirmed and clarified by subsequent medical evidence.  *See, e.g., Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1027-28 (D. Minn. 2010) (concluding that the ALJ erred by declining to consider the opinion of a specialist given after the date last insured where, prior to the expiration of the insurance period, the claimant's other physicians had ordered the claimant to see such a specialist and the subsequent opinion was consistent with earlier diagnoses).

Given the absence of medical records or other evidence showing that Ms. Lane suffered from a more serious neck issue during the relevant period, this Court cannot conclude that the ALJ erred in finding that her neck condition was not a medically determinable severe impairment prior to March 31, 2012.

## III.   Urology Disorders

Ms. Lane next argues that the ALJ erred by finding that her urology disorders do not qualify as a severe impairment.  (Pl.'s Mem. at 11.)  Ms. Lane asserts that the ALJ disregarded a diagnosis of "renal failure, multiple hospitalizations and procedures, and resulting chronic infections" and instead concluded only that her "urinary tract infection" was not sufficiently severe or medically determinable.  (*Id.*)  In particular, Ms. Lane points to evidence in the record that she was diagnosed with chronic bladder infections and had surgical procedures to place a stent and remove a renal stone.  (*Id.* at 6.)  The Commissioner contends that the ALJ's conclusions were adequately supported because Ms. Lane's medical providers did not assess functional limitations related to her urinary tract infections, her infections improved with treatment, and her renal failure diagnosis was accompanied by "unremarkable" test results.  (Def.'s Mem. at 10-12.)

The ALJ acknowledged that Ms. Lane had experienced serious renal and urological symptoms, but concluded that they had largely resolved with treatment. The ALJ observed that treatment notes showed Ms. Lane was hospitalized, in February 2010, in acute renal failure with urinary retention and abdominal discomfort

and that she complained of generalized weakness.  (AR 22.)  He then noted that

Ms. Lane's "exam findings improved significantly within six months of the initial

report of abnormal findings objectively related to the claimant's complaints of fatigue

and malaise, and these do not constitute severe impairments."  (*Id.*)  The ALJ also

considered evidence that Ms. Lane was treated for a recurrent urinary tract infection

in 2011.  (AR 22.)  He found that the infections did not amount to a severe

impairment because they did not result "in more than minimal work-related

restriction on a consistent basis over a 12-month period of time . . . ."  (*Id.*)

Substantial evidence supports these findings.[5]

### Acute Renal Failure

In February 2010, Ms. Lane was hospitalized for acute renal failure.[6]  (AR 405-

07.)  While at the hospital, Ms. Lane "underwent dialysis out of concern for toxic

---

[5]      Ms. Lane does not direct the Court to any evidence that detracts from these
conclusions.  This Court does not find that Ms. Lane has "waived" any argument
relating to her urological conditions by failing to cite to specific record evidence, as
the Commissioner argues she has.  (*See* Def.'s Mem. 10.)  Nevertheless, the absence of
any specific reference to medical records showing that Ms. Lane's urological problems
caused severe restrictions on her ability to engage in work activities undermines
Ms. Lane's assertion that the ALJ's findings are unsupported by substantial evidence.

[6]      The diagnosis alone is not sufficient to demonstrate that the renal failure was a
severe impairment.  *Close v. Astrue*, No. 10-cv-5007-SW-DGK-SSA, 2011 WL
3568862, at *2 (W.D. Mo. Aug. 12, 2011) ("A diagnosis alone is an insufficient basis
for finding that an impairment is severe." (quoting *Wilber v. Astrue*, No. 09-cv-04235,
2010 WL 2772313, at *9 (W.D. Mo. July 12, 2010))); *see also McCruter v. Bowen*, 791
F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically ascertained disability
(Footnote continued on following page)

etiology for renal failure and acidosis." (AR 406.)  But "[t]oxicology studies were unremarkable and the etiology of her metabolic acidosis remain[ed] unclear . . . ." (AR 407; *see also id.* 501-25 (February 2010 hospital records concerning testing that reveal no conclusive etiology).)  After a few days in the hospital, records show that Ms. Lane's "renal function [was] fine" and she appeared to the attending physician to be doing "much better."  (AR 508.)  During her follow up visit after being discharged from the hospital, Dr. Long found her to be "stable post-hospitalization."  (AR 407.)  Six months later, Dr. Long saw Ms. Lane again to address her concerns that she was developing another urinary tract infection.  (AR 393-95.)  Dr. Long prescribed an antibiotic to treat infection in light of Ms. Lane's history and discharged her in "good condition."  (AR 395.)  These records support the ALJ's conclusion that Ms. Lane's acute renal failure improved shortly after her hospitalization.  For this Court to find that the ALJ's handling of Ms. Lane's renal failure diagnosis was error and that he should have included it among Ms. Lane's severe impairments would require the Court to impermissibly reweigh the evidence and substitute its own judgment for that of the ALJ.  *See Woolf v. Shalala¸* 3 F.3d 1210, 1213 (8th Cir. 1993) (providing that the court cannot substitute its own judgment or findings of fact).

---

(Footnote continued from previous page)
must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.").

**Recurring Urinary Tract Infections**

Substantial evidence likewise supports the ALJ's finding that her urinary tract infections did not meet the severe impairment criteria. There are numerous medical records showing that Ms. Lane sought treatment for urinary tract infections during the relevant time period. But none of these records undermines the ALJ's conclusions that Ms. Lane's infections did not significantly affect her ability to work on a consistent basis for a 12-month period. For example, in April 2008, she was treated for a urinary tract and bladder infection, reporting two weeks of pain, but was treated with prescription drugs and instructed to push fluids. (AR 433-34.) In June 2009, Ms. Lane's liver function tests were normal. (AR 526-27.) In June 2011, she saw Dr. Long for a follow-up visit for an infection and complained of abdominal pain, but noted that it was mainly present after meals. (AR 350.) In October and December 2011, in follow-up visits for an infection that was treated with antibiotics, her urinalysis was "completely normal," and she reported feeling better. (AR 333-37, 617-18.) A CT scan in November 2011 revealed no mass lesions or ureteral obstruction. (AR 757-58.) And in February 2012, doctors removed a renal stone, which improved Ms. Lane's struggles with urinary tract infections. (AR 657-62, 976.)

None of these medical records demonstrates that Ms. Lane's infections "were both severely limiting and also materially and adversely impacted her functioning[.]" (Pl.'s Mem. 11.) In general, the records show that routine treatment for the infections between 2008 and early 2012 resulted in improvement of Ms. Lane's condition. Such

evidence supports the ALJ's conclusion that Ms. Lane's recurrent infections did not impose more than minimal work-related restrictions, and none of her treating physicians' records suggested that her infections would cause her to be absent from work or otherwise limit her functioning.   *Compare Johnston v. Astrue*, No. 07-cv-3056, 2009 WL 315689, at *4 (W.D. Ark. Feb. 6, 2009) ("The medical evidence reveals plaintiff would report having symptoms [of conditions including urinary tract infection] for the past day, week, or two weeks and treatment notes indicate these symptoms were relieved with conservative care."), *with Cottrill v. Apfel*, 102 F. Supp. 2d 627, 633-36 (D. Md. 2000) (remanding to the ALJ for further evaluation where medical evidence "establishe[d] that the pain and urinary frequency associated with plaintiff's recurrent urinary tract infections constituted more than a slight abnormality" and was expected to interfere with the claimant's ability to work) (internal quotations omitted).

For these reasons, the Court finds no error with the ALJ's finding that Ms. Lane's urological disorders were not among her severe impairments.

## IV.   Headaches

The ALJ found that Ms. Lane's headaches constituted a severe impairment during the relevant time period.  (AR 20 (listing "chronic headache versus migraine headache" among the severe impairments).)  However, the ALJ found Ms. Lane's complaints about the intensity, persistence, and limiting effects of those headaches were not entirely credible.  (AR 27-29.)  Ms. Lane suggests that the ALJ erred in this

credibility analysis.  She argues that the ALJ "incorrectly found that [her] migraines were not 'particularly' consistent and that they seemed to be well-controlled."[7]  (Pl.'s Mem. 12.)  She contends that the ALJ reached a "completely unsupported conclusory and speculative finding that [her] headaches were both inconsistent and under control."  (*Id.*)

Substantial evidence supports the ALJ's credibility determination concerning Ms. Lane's headaches.  "To assess a claimant's credibility, the ALJ must look to the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions."  *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'"  *Id.* (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)).  The Court defers to an ALJ's credibility judgment where the ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so[.]"  *Id.* (citing *Karlix v. Barnhart*, 457 F.3d 742, 748 (8th Cir. 2006)).

---

[7]     Ms. Lane does not argue that the ALJ erred in finding that her headaches failed to meet or medically equal the severity of the listed impairment for epilepsy in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*See* AR 23 (concluding that Ms. Lane's migraines do not meet or medically equal Listing 11.03).)

In evaluating Ms. Lane's statements regarding her headaches, the ALJ examined the medical evidence from August 2006 through May 2012 and concluded that the evidence was inconsistent with her complaints of a disabling condition.  Certainly, Ms. Lane's medical records show that she sought treatment for headaches many times during the relevant period.  However, her headaches were often well-controlled by medication.  *See Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016) (affirming the ALJ's credibility determination where evidence in the record showed medication was effective in relieving the claimant's symptoms).  For example, in August 2006, Ms. Lane visited Dr. Sheri Bergeron with complaints of a headache and gastritis.  As noted by the ALJ, during this visit Ms. Lane did not appear to be in acute distress and she stated that she was doing well on migraine medications.  (AR 459-60.)  In April 2007, Dr. Bergeron referred her to a neurologist, Dr. David McKee, who prescribed Depakote to treat the headaches with the expectation that it could also prevent the side effects she experienced with her previous medication.  (AR 441-42, 1000-01.)  Two months later, Dr. McKee observed that while Ms. Lane's headaches continued, "they don't sound especially severe," and he prescribed Topamax, a medication that could treat the headaches and had worked well for Ms. Lane in the past.  (AR 999.)  Over the rest of 2007 and the beginning of 2008, Ms. Lane reported to Dr. McKee that Topamax was helpful and controlled her headaches.  (AR 993, 997, 998.)  She again had a normal exam with Dr. McKee in September 2008, and he concluded that she should continue on the Topamax and follow up with her primary

care physician if her symptoms worsened.  (AR 992.)  In January 2009, while seeking

treatment for other health concerns, her attending physician observed that Ms. Lane's

chronic headaches were "well controlled on topiramate."  (AR 651.)  These records

support the ALJ's conclusions because they suggest that Ms. Lane's headache was, in

fact, well-controlled on medication.

Other records also support the ALJ's finding that Ms. Lane's statements about

the intensity of her headaches were not entirely credible.  In August 2011, Ms. Lane

saw Dr. Long again, asserting that she had been experiencing a headache for several

days.  (AR 343-45.)  Dr. Long observed that Ms. Lane had not yet taken her Topamax

that day and that she did not "seem to be suffering from [the headache] at the

moment in a significant way."  (AR 344.)  Dr. Long advised Ms. Lane to go home and

take her prescription medication and some Excedrin to combat the headache.

(AR 345.)  And in May 2012, as observed by the ALJ, Dr. Long treated Ms. Lane with

pain medication to help address her complaints concerning headaches.  Dr. Long

noted that Ms. Lane was alert, oriented, and was not in distress.  (AR 316-16.)  These

records support the ALJ's assessment of the severity of Ms. Lane's headache related

symptoms.

Ms. Lane's medical records reflect that, at times, her headaches could be traced

to situational stress involving concerns about her family.  The ALJ observed that

situational stress could "contribute to [Ms. Lane's] symptoms," but could not be

considered in determining eligibility for benefits.  (AR 34 (discussing various medical

records showing significant situational stress).)  For instance, during an office visit in

which she sought treatment for headaches, Dr. Long noted that Ms. Lane's symptoms

were likely related to situational stress brought on by concern that her son may need

dialysis as a result of his own trouble with renal failure.  (AR 374-75.)  Further, at the

hearing before the ALJ, Ms. Lane testified that while she was on vacation in New

Jersey, her headaches went away.  (AR 57.)  Ms. Lane also testified that she believed

her headaches could have been caused by stress associated with her son and his

girlfriend living in her home.  (AR 57.)  It was proper for the ALJ to consider such

situational causes of an allegedly disabling impairment in evaluating Ms. Lane's claims

that her headaches would prevent her from working.  *See Dunahoo v. Apfel*, 241 F.3d

1033, 1039-40 (8th Cir. 2001) (upholding ALJ's conclusion that claimant's depression

was "situational" where substantial evidence pointed to non-medical reasons for her

symptoms).

In addition, the ALJ factored Ms. Lane's daily activities into his credibility

assessment, concluding that her "ongoing activities during the relevant time period

were consistent with the ability to perform work within the residual functional

capacity" he found Ms. Lane maintained.  (AR 34.)  He observed that Ms. Lane is able

to take care of her personal hygiene, cook, clean, do dishes and assist in carrying

heavy items.  (AR 27.)  The ALJ also noted that in 2009, Ms. Lane completed a

function report showing that she was able to care for her pets, prepare meals, shop

for groceries and clothing, drive a vehicle, "manage finances, and manage personal

care without difficulty." (AR 34.) It is appropriate for the ALJ to consider such evidence in the context of evaluating the intensity, persistence, and limiting effects of impairments.

The ALJ concluded that, although Ms. Lane suffers from headaches, her claims regarding their intensity and frequency were not entirely credible, and he supported that conclusion with references to the record. The Court defers to that finding and concludes that there is no reversible error based on the ALJ's handling of this issue.

## V.     The Light Work RFC Finding

Ms. Lane next argues that the ALJ erred in finding that she maintained the ability to do "light work" with additional limitations.[8] (Pl.'s Mem. 14-15.) The Commissioner argues that the ALJ's RFC finding is supported by the objective evidence in the record. (Def.'s Mem. 17-19.)

### The RFC Finding

The ALJ found that Ms. Lane had the residual functional capacity ("RFC") to perform "light work as defined in 20 CFR 404.1567(b)" with additional limitations.

---

[8]     "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A job involves light work when it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* A person capable of performing a full range of light work "must have the ability to do substantially all of these activities." *Id.* The ALJ's RFC finding identified additional limitations he considered to be supported by the record so that he found Ms. Lane to be somewhat more limited than a person capable of doing a full range of light work. (*See* AR 26.)

(AR 26.)  The ALJ concluded that Ms. Lane's impairments would preclude her from using ladders or working at unprotected heights.  He also found that Ms. Lane could not work around a high concentration of air particulates such as "dusts, gases, fumes, and the like."  Further, the ALJ determined that Ms. Lane should not work in extreme temperatures.  He also found that Ms. Lane's impairments would prevent her from doing work that required "more than occasional postural motions such as bending, twisting, stooping, kneeling, crouching and crawling," and that she could only occasionally perform "overhead tasks."  Finally, the ALJ found that Ms. Lane could have only brief and superficial contact with coworkers and supervisors.  (AR 26.)[9]

### Ms. Lane's Neck Condition

Ms. Lane contends that the ALJ erred by failing to take her neck condition, whether severe or not, into account in reaching his RFC finding.  In assessing a

---

[9]      Referring to part of the definition of "light work" in the regulations, Ms. Lane's memorandum includes a subheading asserting that "[t]he ALJ's finding that [she] can do 'a good deal of walking or standing' is unsupported by substantial evidence in the record."  (Pl.'s Mem. 14.)  Ms. Lane does not otherwise elaborate on this argument.  Nonetheless, the Court notes that the ALJ extensively discussed evidence in the record concerning Ms. Lane's musculoskeletal complaints, including doctors' findings that Ms. Lane demonstrated a good range of motion and appropriate gait, as well as the ability to walk without assistance.  (*See, e.g.*, AR 437 (full range of motion); *id.* at 431 (testing of lower extremities is unremarkable); *id.* at 331 ("Gait and balance are normal."); *id.* at 320 (plaintiff "able to walk into the clinic without assistance"); *id.* at 347 (normal X-rays of the foot and unremarkable exam where plaintiff complained of pain caused by "fair amount of walking apparently in a Walmart store").)  To the extent Ms. Lane challenges the ALJ's "light work" finding on the basis that he should have included additional walking and standing limitations, this evidence supports the ALJ's RFC assessment.

claimant's RFC where the person has more than one impairment, the ALJ must consider "all of [a claimant's *medically determinable impairments* of which [the SSA is] aware, including [the claimant's] *medically determinable impairments* that are not 'severe' . . . ." 20 C.F.R. § 404.1545(a)(2) (emphasis added).  As noted above, substantial evidence supports the ALJ's determination that during the relevant period, Ms. Lane's neck/cervical spine condition was not a medically determinable impairment.  Therefore, the ALJ was not required to consider such a non-medically determinable impairment in making the RFC assessment.[10]  *See Talbot v. Colvin*, No. 3:13-cv-1249 (GTS), 2015 WL 5512039, at *5 (N.D.N.Y. Sept. 15, 2015) ("[A]n ALJ is not obligated to take into consideration impairments which are not medically determinable impairments, because only medical determinable impairments can be considered severe or non-severe."); *Maiorano v. Astrue*, 930 F. Supp. 2d 1240, 1250, 1251 (D. Colo. 2013) (concluding that the ALJ did not err in assessing the claimant's RFC without reference to alleged conditions that were not medically determinable impairments).

For these reasons, the Court concludes that the ALJ did not err by failing to include additional limitations in Ms. Lane's RFC based on her neck condition.

_____

[10]     Even if the ALJ had determined that Ms. Lane's neck condition was medically determinable and non-severe, the Court concludes that the ALJ did not err in reaching his RFC assessment.  The evidence from the relevant period concerning Ms. Lane's neck condition did not clearly demonstrate that additional limitations should have been included in that RFC finding.

### Lower Back Problems

Ms. Lane also asserts that her lower back problems affect her ability to sit for long periods of time, and suggests that the ALJ failed to give those problems proper weight in the RFC.  (Pl.'s Mem. 14.)  However, none of the records referred to by Ms. Lane support reversal of the ALJ's decision to exclude functional sitting limitations from the RFC assessment.[11]

### Upper Extremity Issues

Finally, Ms. Lane contends that the ALJ "did not account for any bilateral upper extremity limitations . . . in spite of [Ms. Lane's] significant impairments . . . and their resulting functional limitations."  (*Id.* at 15.)  She argues that the ALJ should have included fingering and manipulation limitations in the RFC based on evidence that Ms. Lane had reduced grip strength and bilateral tremors.  (*Id.*)

The ALJ reviewed evidence in the record relating to Ms. Lane's complaints concerning her hands.  (AR 21, 22.)  He observed that in late 2006, Ms. Lane sought treatment for right hand numbness and tingling, but concluded that this complaint

---

[11]     AR 287 (post-insured status medical record observing "abnormal gait due to multiple back surgeries" but no assessment or instructions concerning duration requirements for sitting); *id.* at 425-26 (reporting problems with walking and leg pain in February 2009, but no restrictions on sitting in the physician's "assessment and plan"); *id.* at 960-1 (post-insured status medical record showing results of an MRI of plaintiff's lumbar spine); *id.* at 1392-94 (post-insured status record of treatment for right leg pain assessing right sided sciatica); *id.* at 1413-17 (post-insured status record describing further management options to treat low back pain, but including no mention of duration limitations for sitting).

was "a non-medically determinable impairment under the regulations" in light of the medical evidence.  (AR 21.)  For example, the ALJ accurately observed that Dr. Kristan Wegerson assessed this complaint as "carpal tunnel" and recommended Ms. Lane wear wrist splints at work, but noted that Ms. Lane declined any further workup for the issue.  (*Id.*; *id.* at 455-56)  The ALJ also reached this conclusion based on Ms. Lane's normal nerve tests for her left upper extremity.  (*Id.* at 403, 591, 994.)

In 2007, Ms. Lane reported to her neurologist that she had developed a tremor in her hands that made it difficult to write, so the neuorologist switched her back to a medication that previously had been effective in treating her migraine headaches. (AR 999; *see also id.* at 638 (August 2007 examination showing "[s]trength and sensation are normal in her [left] hand").)  An August 2008 examination showed Ms. Lane's "[m]otor strength [was] 5/5 in the upper extremities."  (AR 429.)  The ALJ further considered the results of a February 2010 examination during which Ms. Lane reported experiencing bilateral hand tremors.  The examination revealed that her grip strength was reasonably strong and that she could perform rapid alternating movements of her hands.  (AR 22, 411; *see also id.* at 407 ("Grips were symmetric on right and left and sensation to light touch was intact throughout both hands tested.").) Similarly, in August 2010, Ms. Lane reported to Dr. Long that she was experiencing left forearm pain.  (AR 394-95.)  On examination Dr. Long again found that her grip strength was strong and symmetrical and that she was able to symmetrically perform

rapid bilateral alternating upper extremity movements, "although somewhat slow[ly]."

(AR 395.)

Ms. Lane points to evidence from outside the relevant period of her insured

status, including medical records from June 2014 and January 2015. (Pl.'s Mem. 5-6.)

In June 2014, Dr. Long suspected her hand tremors may have been caused by some

of her medications (AR 1338), and in January 2015, he noted that Ms. Lane continued

to have "occasional hand tremors," typically at night, and observed that she did not

have a tremor during the appointment (AR 1370-72).

In addition, the record reflects that Ms. Lane reported engaging in a number of

activities involving the use of her hands.[12]  She reported walking dogs on a leash,

feeding them, and throwing a stick.  (AR 178.)  She also reported grocery shopping

and folding clothes to help provide care for others in her household.  (AR 177-78.)

Ms. Lane also explained that she would make meals without difficulty, dust furniture,

wash dishes, and do light vacuuming around the house.  (AR 179.)  Among her

hobbies, Ms. Lane reported drawing sketches. (AR 181.)

---

[12]     Although Ms. Lane testified at the hearing before the ALJ that she had
difficulty holding a paper plate and dressing herself due to her hand issues, the ALJ
appropriately relied on additional evidence of her daily activities in considering the
credibility of her statements about the intensity, persistence, and limiting effects of the
symptoms caused by the condition of her hands.  (*Compare* AR 27 (noting plaintiff's
testimony at the hearing), *with id.* at 34-35 (discussing other evidence concerning
plaintiff's daily activities).)

Considering all of this evidence, the Court cannot conclude that the ALJ committed error in failing to include additional limitations in his RFC assessment for fingering and manipulation.  Many of these records show normal testing, adequate grip strength, and the ability to move her hands symmetrically.  No care providers or diagnoses required Ms. Lane to limit the use of her hands in any particular way.  To reverse the ALJ based on this record or remand the matter for the ALJ to further develop the record with regard to the availability of jobs Ms. Lane could perform if additional fingering and manipulation limitations were added to her RFC would require the Court to disregard the highly deferential standard of review applicable to this case.  This Court will not overlook the substantial evidence in the record that supports the ALJ's decision not to include fingering and manipulation limitations in Ms. Lane's RFC.

Because the ALJ properly handled the evidence concerning Ms. Lane's neck condition, her lower back impairment, and the issues with her hands, this Court concludes that the ALJ committed no reversible error in reaching his RFC assessment.[13]

---

[13]   Ms. Lane has not raised any issue concerning the ALJ's findings with regard to her asthma or other pulmonary issues or her mental health concerns in the context of the RFC assessment.  Nor has Ms. Lane argued that the ALJ should have concluded either of these impairments meets or medically equals the criteria of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  Accordingly, this Court will not further address these issues.

## Recommendation

Based on the foregoing, the Court makes the following recommendation:

1. Plaintiff's motion for summary judgment (ECF No. 13) should be **DENIED**.

2. The Commissioner's motion for summary judgment (ECF No. 16) should be **GRANTED**.

3. The Commissioner's decision that plaintiff is not disabled should be **AFFIRMED**.


Date: September 27, 2016                    _s/ Katherine Menendez_
                                            Katherine Menendez
                                            United States Magistrate Judge


## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.